UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAKIA ROSE,

        Plaintiff,

    v.

O. GARRITT, *et al.*,

        Defendants.

No. 16-CV-3624 (KMK)

OPINION & ORDER

<u>Appearances:</u>

Michael H. Sussman, Esq.
Valeria A. Gheorghiu, Esq.
Jonathan R. Goldman, Esq.
Sussman & Watkins
Goshen, N.Y.
*Counsel for Plaintiff*

Deanna L. Collins, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

  Plaintiff Nakia Rose ("Plaintiff"), currently incarcerated at Eastern New York Correctional Facility ("Eastern"), brings this Action against Correction Officer ("C.O.") Daniel J. LaVelle ("LaVelle"), C.O. Za'Quawn Griset ("Griset"), C.O. Warren Freeman ("Freeman"), C.O. Robert J. Cocuzza ("Cocuzza"), and Sergeant ("Sgt.") Owen Garritt ("Garritt"; collectively, "Defendants") pursuant to 42 U.S.C. § 1983. (*See generally* Compl. (Dkt. No. 2).) Before the Court is Defendants' Partial Motion for Summary Judgment (the "Motion"). (*See* Not. of Mot. (Dkt. No. 75).) For the reasons explained herein, the Motion is denied.

I. Background

A. Factual Background

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Statement of Material Facts in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 80)); Plaintiff's response to that statement, (Pl.'s Resp. To Defs.' 56.1 ("Pls.' 56.1") (Dkt. No. 85)); Plaintiff's counterstatement of facts, (Pl.'s Counterstatement to Defs.' 56.1 ("Pl.'s Counter 56.1") (Dkt. No. 85)); and the admissible evidence submitted by the Parties.[1] The Court recounts only those facts necessary for consideration of the instant Motion.

During the relevant period, Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven"). (Defs.' 56.1 ¶ 1 (citing Compl.; Decl. of Deanna L. Collins, Esq. in Supp. of Mot. ("Collins Decl.") Ex. A ("Inmate Information") (Dkt. Nos. 76, 76-1).) On September 14, 2014, Plaintiff was housed in "H-Block," a block of cells at Green Haven. (*Id.* ¶ 2 (citing Collins Decl. Ex. B ("Defs.' Dep. Tr. Excerpt"), at 4 (Dkt. No. 76-2).)[2] H-Block is comprised of "multiple tiers of cells," which are separated from one another by staircases. (*Id.*

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, the fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). Where possible, the Court relies on the facts as presented in the Parties' 56.1 Statements. However, direct citations to the record are used where the Parties' 56.1 Statements do not include relevant facts or do not accurately characterize the record.

[2] The deposition transcript excerpt submitted by Defendants does not include numbered pages. Thus, to avoid confusion, the Court references the ECF-stamped page numbers at the top of each page.

(citing Decl. of Daniel J. LaVelle ("LaVelle Decl.") ¶ 6 (Dkt. No. 77); Defs.' Dep. Tr. Excerpt 4–5).) Plaintiff was housed in "4-Company," which is located on the ground floor of H-Block. (*Id.* (citing LaVelle Decl. ¶ 6; Defs.' Dep. Tr. Excerpt 4).) 2- and 5-Companies are one flight of stairs above 4-Company, and 3- and 6-Companies are two flights of stairs above 4-Company. (*Id.*) LaVelle has been employed as a C.O. at Green Haven since around December 20, 2012, and has been employed by New York State Department of Corrections and Community Supervision ("DOCCS") since October 14, 2012. (*Id.* ¶ 4 (citing LaVelle Decl. ¶ 2).) Griset has been employed by DOCCS since March 26, 2012, and worked as a C.O. at Green Haven from July 2012 to January 2016. (*Id.* ¶ 6 (citing Decl. of Za'Quawn Griset ("Griset Decl.") ¶ 2 (Dkt. No. 78).) In January 2016, Griset began working at Bedford Correctional Facility, but returned to Green Haven in January 2018. (*Id.*)

On September 14, 2014, LaVelle was assigned to a 3:00 p.m. to 11:00 p.m. shift at Green Haven. (*Id.* ¶ 5 (citing LaVelle Decl. ¶ 4).) During this shift, LaVelle was the "assigned Rec (Recreation) 1 officer in E&F Yard," and was also responsible for 3- and 6-Companies in H-Block for the "first few hours" of the shift. (*Id.*) Griset was also assigned to the 3:00 p.m. to 11:00 p.m. shift and was the "Number 2 officer" on the "F&G Corridor." (*Id.* ¶ 7 (citing Griset Decl. ¶ 4).) Griset was therefore responsible for "maintaining order in the area during inmate movement," and was posted "in the intersection of F&G corridor and the hallway that runs past H-Block," which is the equivalent of approximately one city block away from H-Block. (*Id.*)

That evening, Plaintiff and other inmates housed in 4-Company were released from their cells for recreation in the yard. (*Id.* ¶ 9 (citing Collins Decl. Exs. D ("Garritt Force Report") (Dkt. No. 76-4); E ("Miller Force Report") (Dkt. No. 76-5); Defs.' Dep. Tr. Excerpt 4, 7–9; LaVelle Decl. ¶ 7; Griset Decl. ¶ 5); Pl.'s Counter 56.1 ¶ 4.) In order to get to the yard, the

3

inmates walked through the front door of H-Block and into the hallway. (Defs.' 56.1 ¶ 9 (citing Garritt Force Report; Miller Force Report; Defs.' Dep. Tr. Excerpt 4, 7–9; LaVelle Decl. ¶ 7; Griset Decl. ¶ 5)).) At the time that they were released for recreation, LaVelle was on the third tier of H-Block with 3- and 6-Companies. (*Id.* ¶ 10 (citing LaVelle Decl. ¶ 8).) LaVelle did not see the 4-Company inmates, including Plaintiff, exit through the front door of H-Block and enter the hallway to go to recreation. (*Id.*) Meanwhile, as the inmates left their cells, Miller was stationed at a podium close to the front door, where he was checking inmate identification cards. (*Id.* ¶ 11 (citing Defs.' Dep. Tr. Excerpt 8–9; Collins Decl. Ex. F ("Pl.'s Disciplinary Hr'g Tr."), at 31–32 (Dkt. No. 76-6)).) Plaintiff walked past the podium on his way out of H-Block and showed Miller his identification. (Pl.'s Counter 56.1 ¶¶ 1–2 (citing Aff'n of Michael H. Sussman, Esq. ("Sussman Aff'n") Ex. 1 (Pl.'s Dep. Tr. Excerpt), at 66–70 (Dkt. Nos. 83, 83-1)).)

According to Defendants, when Plaintiff exited H-Block, he was "ordered by correctional staff to face the wall and place his hands on the wall," after which he was "pat-frisked." (Defs.' 56.1 ¶ 12 (citing Collins Decl. Ex. C ("Defs.' Use of Force Report") (Dkt. No. 76-3); Defs.' Dep. Tr. Excerpt 12, 15–16).) During the pat-frisk, Plaintiff "abruptly and suddenly turned to his right and came off the wall." (Defs.' Use of Force Report.) At this point, "force became necessary." (*Id.*) Miller first "forced [Plaintiff] face first against the wall," and then, after Plaintiff refused to stop resisting, "forced [Plaintiff] to the ground face first, landing on top of him." (*Id.*) Miller moved Plaintiff's right wrist to the middle of his back until Plaintiff was handcuffed. (*Id.*)

According to Plaintiff, however, Miller ordered him and some of the other inmates to stop as they walked by the podium. (Pl.'s Counter 56.1 ¶ 5 (citing Pl.'s Dep. Tr. Excerpt 73–74).) Upon hearing the demand from Miller, Plaintiff stopped "about six or seven feet from the main entrance door to H-block," and did not speak or say anything in response. (*Id.* ¶¶ 11–13

4

(citing Pl.'s Dep. Tr. Excerpt 74–76).) As this occurred, Freeman, Griset, Cocuzza, and Garritt were present, as well as a "new sergeant." (*Id.* ¶ 6 (citing Pl.'s Dep. Tr. Excerpt 73–74, 81); Pl.'s Disciplinary Hr'g Tr. 55.) Garritt was standing "with numerous officers" approximately ten to fifteen feet away from Plaintiff, and Griset was near him, (Pl.'s Counter 56.1 ¶¶ 6–10, 16 (citing Pl.'s Dep. Tr. Excerpt 82–83, 89–90)), although Griset states that he was not present during the alleged incident, (Griset Decl. ¶ 6). Miller then ordered the other inmates he had stopped to go back to the block, leaving Plaintiff alone with the C.O.s and Sergeant. (Pl.'s Counter 56.1 ¶ 17 (citing Pl.'s Dep. Tr. Excerpt 85–87, 89).) Plaintiff then noticed "about three other officers" walking toward where he had been stopped, one of whom was Freeman. (*Id.* ¶ 18 (citing Pl.'s Dep. Tr. Excerpt 85).)[3] Plaintiff had seen some of these officers in the jail before but did not know their names. (Pl.'s Dep. Tr. Excerpt 101).)

Once the other inmates left the hallway, Miller, who was "less than ten feet from [P]laintiff," said, "Rose, stop right there." (Pl.'s Counter 56.1 ¶¶ 19–20 (citing Pl.'s Dep. Tr. Excerpt 91–92).) At this point, "numerous officers" stood to Plaintiff's left and right. (*Id.* ¶ 23 (citing Pl.'s Dep. Tr. Excerpt 95).) C.O. McNichol ("McNichol") then came out of the "bubble," which was a "secured area at the front of [4-Company]" that controlled the cell doors, took the H-block key from Miller, and closed the door. (*Id.* ¶¶ 3, 25 (citing Pl.'s Dep. Tr. Excerpt 71–72, 99–100).) Plaintiff was then "left in the hallway with [] Miller, Cocuzza, Griset, [] Garritt[,] and another unidentified sergeant." (*Id.* ¶ 26 (citing Pl.'s Dep. Tr. Excerpt 99).) Miller, who was wearing dark gloves, ordered Plaintiff to face the wall, put his hands "high up on the wall," and step back. (*Id.* ¶¶ 27–28, 30, 32 (citing Pl.'s Dep. Tr. Excerpt 99, 106–09).) Miller was located

---

[3] Plaintiff's Response to Defendants' Rule 56.1 Statement contends that one of these officers was LaVelle, but this assertion is not directly supported by the record. (Pl.'s 56.1 ¶ 13 (citing Pl.'s Dep. Tr. Excerpt 101).)

to Plaintiff's right, Freeman was to Plaintiff's left, Cocuzza was behind him, and the sergeants were "a few steps" away. (*Id.* ¶ 29 (citing Pl.'s Dep. Tr. Excerpt 106).) Cocuzza then pat-frisked Plaintiff, taking some items out of his pockets and throwing them on the floor. (*Id.* ¶ 31 (citing Pl.'s Dep. Tr. Excerpt 112).) Miller proceeded to "uppercut" Plaintiff under his chin, to the right side of his jaw, and punched Plaintiff on the side of his face. (*Id.* ¶ 32 (citing Pl.'s Dep. Tr. Excerpt 107–09).) Freeman also punched Plaintiff, hitting him on the left side of his face, near his eye. (*Id.* ¶ 33 (citing Pl.'s Dep. Tr. Excerpt 107, 109–10).) Upon Garritt's instruction, Miller then "slammed" Plaintiff to the floor. (*Id.* ¶¶ 34–35 (citing Pl.'s Dep. Tr. Excerpt 110, 113, 117).) At this point, Cocuzza and Freeman were punching Plaintiff, and "[n]umerous officers were beating, kicking[,] and punching [P]laintiff with blows coming from all directions," striking Plaintiff "all over his body." (*Id.* ¶¶ 36–38 (citing Pl.'s Dep. Tr. Excerpt 117–20).) Freeman, who was initially stomping on Plaintiff's ankle, proceeded to hold Plaintiff's ankle and twist it, "trying to bend it," which he continued to do "at the end when everybody stopped." (*Id.* ¶ 39 (citing Pl.'s Dep. Tr. Excerpt 122–24); Defs.' Dep. Tr. Excerpt 25.) During the altercation, Griset "was right there" and standing with Sgt. Garritt. (Pl.'s Counter 56.1 ¶¶ 40, 42 (citing Pl.'s Dep. Tr. Excerpt 116–17).) Plaintiff testified that Griset did not hit him, but Plaintiff does not know whether Griset kicked him. (*Id.* ¶ 41 (citing Pl.'s Dep. Tr. Excerpt 118–19).)[4] According to Defendants, Griset did not "punch, kick, beat[,] or otherwise assault Plaintiff," and also did not see any correctional staff do so. (Defs.' 56.1 ¶¶ 16–17 (citing Griset Decl. ¶¶ 8–10; Defs.' Dep. Tr. Excerpt 21–23).) The assault lasted approximately one minute, although Plaintiff is not certain of the timing and testified that it "felt like hours." (Pl.'s Counter 56.1 ¶ 43 (citing Pl.'s

---

[4] Plaintiff also testified during his deposition that Griset "wasn't one of the officers that put his hand[s] on [Plaintiff]," "[Griset] never touched me," and "Griset wasn't punching [Plaintiff] and kicking [Plaintiff] at that time." (Defs.' Dep. Tr. Excerpt 21–23.)

Dep. Tr. Excerpt 120); Defs.' Dep. Tr. Excerpt 31.) He recalls that others watched the assault, but he does not remember their names. (*Id.* at 25.)

At the time that Plaintiff was ordered to face the wall, Defendants contend that LaVelle was on 3- and 6-Companies and thus not in the hallway and not involved in ordering, seeing, or executing the pat-frisk. (Defs.' 56.1 ¶ 13 (citing LaVelle Decl. ¶ 9; Defs.' Dep. Tr. Excerpt 10, 15).) Instead, at approximately 6:20 p.m., LaVelle was about to depart from 3- and 6-Companies to go to the E&F yard when he "heard a commotion that seemed to be coming from the ground floor." (*Id.* ¶ 14 (citing LaVelle Decl. ¶ 10).) LaVelle "immediately responded" and moved from 3- and 6-Companies to the ground floor, which took him about one minute. (*Id.*) Prior to arriving on the ground floor, LaVelle "could not tell who was involved or what was going on." (*Id.*) When LaVelle arrived on the hallway near H-block, he saw Miller on top of Plaintiff, who was on the floor. (*Id.* ¶ 15 (citing LaVelle Decl. ¶ 11).) Miller appeared to be "in need of assistance" and "struggling with a non[-]complaint inmate." (Garritt Force Report 1.) LaVelle "immediately assisted" by taking out his handcuffs and helping Miller and "fellow security staff" put the handcuffs on Plaintiff's wrists. (Defs.' 56.1 ¶ 15 (citing LaVelle Decl. ¶¶ 11–14; Defs.' Dep. Tr. Excerpt 25–26); Defs.' Use of Force Report.) After Plaintiff was handcuffed, he "became compliant" and "all force ended." (*Id.*) According to Defendants, Plaintiff was not assaulted when he was handcuffed and taken off the floor, and LaVelle "did not punch, kick, beat[,] or otherwise assault Plaintiff," or view any correctional staff taking such actions. (Defs.' 56.1 ¶¶ 15, 18–19 (citing LaVelle Decl. ¶¶ 11–14; Defs.' Dep. Tr. Excerpt 25–27).)

According to Plaintiff, however, LaVelle was present during the assault "by his own account," and because he "walked down the hallway before the pat frisk occurred." (Pl.'s 56.1 ¶¶ 13, 18, 19 (citing Pl.'s Dep. Tr. 101, 117–20); Pl.'s Counter 56.1 ¶ 46 (citing Sussman Aff'n

7

Exs. 4 ("LaVelle Use of Force Report") (Dkt. No. 83-4); 5 ("Garritt Use of Force Report") (Dkt. No. 83-5)).) Although Plaintiff "could not recognize or identify [] LaVelle," Plaintiff denies that LaVelle did not assault him, stating that he "felt numerous officers, several of whom he could not identify," hurt him when he was on the ground. (Pl.'s 56.1 ¶ 18 (citing Pl.'s Dep. Tr. 117–20); Pl.'s Counter 56.1 ¶ 47 (citing Pl.'s Dep. Tr. 85, 95, 101).)[5] Plaintiff also states that there was "never a time when Miller alone was on top of" him, and "numerous officers were punching and kicking Plaintiff after he was taken to the ground." (Pl.'s 56.1 ¶ 15 (citing Pl.'s Dep. Tr. Excerpt 107–24).) According to Plaintiff, he was "stood up" once the assault ended. (Pl.'s Dep. Tr. Excerpt 122.)

After Plaintiff was handcuffed, Garritt ordered Griset and Cocuzza to take Plaintiff to the Secure Housing Unit ("SHU"). (Defs.' 56.1 ¶ 20 (citing Garritt Force Report; Griset Decl. ¶ 10; Defs.' Dep. Tr. Excerpt 27–28).) During this escort, no assault occurred. (*Id.*) Plaintiff was then taken to "[M]edical." (Pl.'s Counter 56.1 ¶¶ 44–45 (citing Pl.'s Dep. Tr. Excerpt 123, 125, 130; Sussman Aff'n Exs. 2 ("Griset Inmate Escort Form") (Dkt. No. 83-2); 3 ("Cocuzza Inmate Escort Form") (Dkt. No. 83-3)).) Plaintiff complained of pain in his jaw, eye, ribs, back, and ankle. (*Id.* ¶ 45 (citing Pl.'s Dep. Tr. Excerpt 125, 130).)

B. Procedural Background

Plaintiff filed the Complaint on May 13, 2016. (Compl.) The Court initially granted Plaintiff's pro se request to proceed in forma pauperis on June 7, 2016, (Dkt. No. 5), and issued two Orders of Service directing service on Defendants, (*see* Dkt. Nos. 7, 24). On August 2, 2017, certain Defendants filed an Answer. (Answer (Dkt. No. 35).) The same day, Defendants

---

[5] Plaintiff testified during his deposition that he did not see LaVelle during the altercation but understood that he was present because he "endorsed the ticket" and wrote that he helped handcuff Plaintiff. (Defs.' Dep. Tr. Excerpt 28–29.)

filed a partial Motion To Dismiss. (Dkt. Nos. 36–37.) After receiving an extension from the Court, Plaintiff filed a response to the Motion To Dismiss on October 12, 2017, (Dkt. No. 48), and Defendants filed a reply on November 1, 2017, (Dkt. No. 49).

On January 16, 2018, the Court granted Defendants' Motion To Dismiss, finding that Plaintiff failed to establish the personal involvement of two of the Defendants, failed to state a claim of deliberate medical indifference against another Defendant, and failed to state a procedural due process claim against Miller, who is since deceased. (Dkt. Nos. 51, 54.) Although the Court's dismissal was without prejudice, Plaintiff did not file an amended complaint. Thus, the Court dismissed these claims with prejudice for failure to prosecute, (Dkt. No. 52), and adopted a discovery schedule on May 14, 2018, (Dkt. No. 58), which the Court subsequently extended once, (Dkt. No. 68).

On February 1, 2019, Defendants requested leave to file a partial motion for summary judgment. (Dkt. No. 71.) Because Plaintiff failed to respond to Defendants' request by the Court-ordered deadline, the Court granted Defendants' request and ordered that Defendants file any such motion by March 26, 2019, Plaintiffs submit a response by April 26, 2019, and Defendants submit a reply by May 18, 2019. (Dkt. No. 73.)

Defendants filed the instant Motion on March 26, 2019. (Not. of Mot.; Defs.' Mem. in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 79); Defs.' 56.1; Collins Decl.; LaVelle Decl.; Griset Decl.).) After receiving an extension from the Court, (Dkt. No. 82), Plaintiff filed a response to Defendants' Motion on April 29, 2019. (Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 84); Pl.'s 56.1; Pl.'s Counter 56.1; Sussman Aff'n).) Defendants filed a Reply on May 23, 2019. (Defs.' Reply Mem. in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 86).)

II. Discussion

Defendants move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that there is no evidence of LaVelle's and Griset's personal involvement in the alleged altercation.

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility

that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in

11

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted).) Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

B. Analysis

1. Applicable Law

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citations and alterations omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

2. Personal Involvement of LaVelle

Defendants argue that they are entitled to summary judgment on Plaintiff's claims against LaVelle because Plaintiff has set forth no evidence to suggest that LaVelle was present during the alleged assault, or that he had a realistic opportunity to intervene. LaVelle denies participating in or witnessing the alleged use of excessive force, instead explaining that he was two floors above the incident when he initially "heard a commotion" and "immediately

13

responded to the area." (LaVelle Decl. ¶¶ 10, 13, 14.) Once LaVelle arrived, he "did not see any correctional staff punch, kick, beat, or otherwise assault Plaintiff" and did not do so himself, instead assisting in handcuffing Plaintiff. (*Id.* ¶¶ 12–14.)

Plaintiff, however, alleges that he was assaulted not only before, but also after he was handcuffed. (*See* Compl. 3 ("Plaintiff was immediately handcuffed. Plaintiff was th[e]n beaten by several of [D]efendants.").) Because Plaintiff's Complaint is verified, the Court may "treat[] [it] as an affidavit for summary judgment purposes, and therefore will [] consider[] [it] in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). This rule is not limited to the verified complaints of pro se plaintiffs. *See Barza Dev. Corp. v. Meister Seelig & Fein LLP*, No. 16-CV-7763, 2018 WL 2356664, at *5–6 (S.D.N.Y. May 10, 2018) ("Because the verified complaint was signed by [the represented plaintiff] under penalty of perjury, it is the equivalent of an affidavit for the purposes of this summary judgment motion, to the extent it contains statements of fact based on [the plaintiff's] personal knowledge." (citation omitted) (collecting cases)); *see also Curtis v. Cenlar FSB*, 654 F. App'x 17, 20 (2d Cir. 2016) (stating that the court "may treat" the plaintiff's verified complaint "as an affidavit for summary judgment purposes" so far as the allegations therein "were made on personal knowledge" (citation omitted)). Here, Plaintiff's Complaint is verified because it is signed by Plaintiff and states that it is "true and correct" "under penalty of perjury." (Compl. 5.) The facts set forth about the alleged assault would also be well within Plaintiff's knowledge. Thus, the Court will consider Plaintiff's allegation that he was "immediately handcuffed" and "th[e]n beaten by several of the [D]efendants," (*id.* at 3).

Contrary to Plaintiff's assertion, Defendants state that no assault occurred once Plaintiff was handcuffed. (Defs.' 56.1 ¶ 15.) Thus, although it is undisputed that LaVelle was in the hallway with Plaintiff and that he assisted in handcuffing him, (LaVelle Decl. ¶ 11–12), it is disputed whether Plaintiff was beaten after he was handcuffed and whether LaVelle participated or failed to intervene in that assault. "[P]laintiff need not establish who, among a group of officers directly participated in the attack and who failed to intervene"; instead, Plaintiff "must submit some sort of evidence that [LaVelle] was present at the scene of the alleged assault." *Munoz v. Martinez*, No. 03-CV-0828, 2005 WL 1355094, at *4 (S.D.N.Y. June 8, 2005) (citation and quotation marks omitted); *see also John v. City of New York*, —F. Supp. 3d—, 2017 WL 976934, at *3 (E.D.N.Y. Mar. 13, 2017) (same, in the context of alleged excessive force during an arrest). Because both Plaintiff and Defendants have set forth facts establishing LaVelle's presence in the hallway, the dispute over when Plaintiff was handcuffed and when the alleged assault occurred is sufficient to sustain Plaintiff's claims of excessive force and/or failure to intervene against LaVelle at this stage. *See Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at *7 (S.D.N.Y. Apr. 11, 2014) ("Because the parties present conflicting testimony concerning the sequence of events preceding and immediately following the handcuffing of Plaintiff, there exists a genuine dispute of material fact . . . ." (citation omitted)); *cf. Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *23–24 (S.D.N.Y. Dec. 17, 2015) (granting summary judgment with respect to the personal involvement of an officer in an alleged assault when the officer was present only when the plaintiff was handcuffed, and the plaintiff did not allege that excessive force was used at that time).

Defendants contend that during his deposition, Plaintiff "testified that the officers had stopped assaulting him by the time he was handcuffed." (Defs.' Mem. 5, 8–9.) However, this is

a mischaracterization of Plaintiff's testimony.[6] In one of the deposition portions cited by Defendants, Plaintiff was asked about what happened after the alleged assault. (Defs.' Dep. Tr. Excerpt 25.) He replied, "What happened afterwards was I was taking [sic] up[,] and Officer Garritt was talking to two of the officers. While they had me handcuffed, they stood me up." (*Id.*) In another excerpt cited by Defendants, Plaintiff testified that Freeman stomped on his ankle and, "[a]t the end when everybody stopped, he had [Plaintiff's ankle] in his [hand] and basically still was twisting it." (*Id.* at 26.) This testimony does not affirmatively establish when Plaintiff was handcuffed and whether it was before, during, or after the alleged use of force. Plaintiff's statement that he was "stood [] up" and "tak[en] up" "[w]hile [he] [was] [] handcuffed," (*id.* at 25), suggests only that Plaintiff had handcuffs on when he was taken off the floor. It does not, as Defendants suggest, preclude the possibility that Plaintiff had been handcuffed by LaVelle earlier, when the alleged assault was still ongoing. Additionally, even if the alleged violence had ceased by the time Plaintiff was handcuffed, he also testified that Freeman continued to "twist[]" his ankle "[a]t the end when everybody [had] stopped." (*Id.* at 26.) Therefore, even if LaVelle did arrive in the hallway after Defendants allegedly stopped kicking and punching Plaintiff, it would remain disputed whether LaVelle continued to twist Plaintiff's ankle at that time, and whether LaVelle witnessed that use of force. (*See* LaVelle Decl. ¶ 14 ("I did not see any correctional staff punch, kick, beat or otherwise assault Plaintiff when I arrived at the scene or thereafter.").)

---

[6] Defendants also argue that Plaintiff failed to specifically controvert the fact that Plaintiff was not assaulted while he was handcuffed, which should deem this fact admitted. (Defs.' Mem. 6 (citing Pl.'s 56.1 ¶ 15).) However, given that the portion of Plaintiff's deposition testimony cited by Defendants for this fact does not directly support it, and Plaintiff's verified Complaint in fact disputes it, the Court finds that whether the alleged assault had stopped by the time Plaintiff was handcuffed raises an issue of fact.

16

Defendants highlight Plaintiff's testimony that he "did[ not] see" LaVelle at the scene of the alleged incident but instead relied on the fact that LaVelle "said he was there," which was based on Lavelle's endorsement of a "ticket" stating that he helped handcuff Plaintiff. (Defs.' Dep. Tr. Excerpt 28.) The Court agrees that such documentary evidence, without more, would be insufficient to establish that LaVelle was present during the alleged use of force. *See Stroe v. City of New York*, No. 02-CV-1036, 2008 WL 4513823, at *3 (S.D.N.Y. Sept. 30, 2008) (dismissing claims against a defendant who was present only after the alleged force had ended, and when plaintiff testified that his claims against that defendant were based solely on the fact that his signature appeared on paperwork related to the arrest); *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *3 (S.D.N.Y. Mar. 31, 2008) ("[The] [p]laintiff admitted that he was not sure whether [the defendant] was one of the police officers who arrested him, and that the reason [the] [d]efendant [] was named . . . was because [the] [p]laintiff had seen his name on [the] [p]laintiff's felony complaint."). In those cases, however, there was no dispute of fact as to whether the defendant in question was present during the use of excessive force; instead, it was undisputed that the defendant was not present or was present only after the alleged assault. Here, such a dispute exists. Accordingly, LaVelle is not entitled to summary judgment on the basis of a lack of personal involvement.[7]

---

[7] Although Defendants' Motion is denied, the Court notes that Plaintiff's argument that "a reasonable jury could conclude . . . that [LaVelle] was one of the [C.O.s] [P]laintiff did not know and could not identify" who walked towards Plaintiff before the alleged violence occurred, (Pl.'s Mem. 9; *see also* Pl.'s 56.1 ¶¶ 13–14; Pl.'s Counter 56.1 ¶ 18), is speculative, and, in fact, belied by the rest of Plaintiff's testimony.

With respect to the three officers, Plaintiff testified that Freeman was among them, but that he did not know the names of the other two. (Pl.'s Dep. Tr. Excerpt 101.) He also testified that he could not recall the officers' age, hair color, and whether they had facial hair, though he did recall that they were all white males. (*Id.* at 102–03.) However, Plaintiff later testified that he "did[] [not] see [LaVelle]" during the incident. (Defs.' Dep. Tr. Excerpt 28.) Thus, it stands to reason that had LaVelle been one of the three officers Plaintiff saw, Plaintiff would have been

### 3. Personal Involvement of Griset

Defendants similarly argue that Plaintiff has not presented sufficient evidence to establish that Griset physically assaulted Plaintiff. (Defs.' Mem. 10–11.) While Defendants do not seek summary judgment on a failure to intervene claim against Griset, they do seek summary judgment on a claim of excessive force. (Defs.' Reply 2–3.) However, as stated above, Plaintiff "need not establish who, among a group of officers directly participated in the attack and who failed to intervene"; instead, Plaintiff "must submit some sort of evidence that [Griset] was present at the scene of the alleged assault." *Munoz*, 2005 WL 1355094, at *4 (citation and quotation marks omitted); *see also Hoyt v. Prack*, No. 13-CV-920, 2016 WL 929336, at *6 (W.D.N.Y. Mar. 11, 2016) ("An officer may be personally involved in the use of excessive force if he either directly participates in an assault or if he was present during the assault, yet failed to intervene on behalf of the victim . . . ." (citation omitted)). Plaintiff has satisfied this burden here, as he consistently testified that Griset was present at the alleged incident. (*See* Defs.' Dep. Tr. Excerpt 9–10 (stating "[w]hen we got pulled over . . . [] Miller[,] . . . [] Garritt, [] Freeman, [] Griset[,] and Cocuzza" were present), 14–15 ("When I first entered the hallway . . . [t]here was another sergeant, [] Miller, [] Griset.").) Further, it is "especially true" that Plaintiff need not establish who directly participated in an attack and who failed to intervene "where the acts complained of by [] [P]laintiff . . . are likely to have prevented [P]laintiff from identifying which . . . [D]efendant officers specifically engaged in the bad acts." *Kornegay v. New York*, 677 F.

---

able to identify him. The suggestion that Plaintiff's statements establish that LaVelle was one of these three officers mischaracterizes the substance of Plaintiff's testimony.

Supp. 2d 653, 657–58 (W.D.N.Y. 2010) (citation and quotation marks omitted). Here, Plaintiff alleges that he was "slammed" to the ground and that "blows [were] coming from all different directions," (Pl.'s Dep. Tr. Excerpt 117, 119–20), which conceivably could have prevented him from identifying the specific aggressors. Thus, Plaintiff has set forth sufficient evidence to create a genuine issue of fact with respect to Griset's involvement in the alleged assault.

According to Defendants, Plaintiff testified that Griset did not assault him. (*See* Defs.' Mem. 10; Defs.' Dep. Tr. Excerpt 21 (testifying, "I could say [Griset] wasn't one of the officers that put his hand on me. . . . [Griset] never touched me. He was right there. He was one of the officers that was there when we came out."), 22 (testifying that when he was slammed to the ground and punched and kicked by multiple officers, "I don't think it was Griset. Griset wasn't punching and kicking me *at that time*." (emphasis added)), 23 ("[Griset] wasn't punching me.").) However, Defendants omit the fact that shortly after making these statements, Plaintiff was asked whether Griset kicked him, to which he responded, "I'm not sure if Griset kicked me." (Pl.'s Dep. Tr. Excerpt 119.) Based on this testimony and the fact that Plaintiff may have been unable to identify who was hitting and kicking him, the Court cannot conclude that Plaintiff has conceded that Griset was not involved in the assault. Thus, there is a dispute as to whether Griset was present during the alleged attack and whether Griset kicked Plaintiff. (*See* Griset Decl. ¶¶ 7–8 (stating that Griset "was not present at the alleged incident outside of H-Block" and "did not punch, kick, beat[,] or otherwise assault Plaintiff on September 14, 2014").) Were the Court to grant summary judgment on the basis of Griset's statement alone, it would be tantamount to making an impermissible credibility determination. *Jeffreys*, 426 F.3d at 551

(stating, as a general rule, that "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage").

Accordingly, Griset is not entitled to summary judgment.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 75.) The Court will hold a status conference on Wednesday, March 12, 2020 at 2:00 p.m.

SO ORDERED.

Dated: January 23, 2020
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE